**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **GREGORY VALANCIUS,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CATHOLIC DIOCESE OF NASHVILLE**<br><br>**Defendant** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **NO. __________**<br><br>**JURY DEMAND** |

**COMPLAINT**

Plaintiff Gregory Valancius respectfully states to the Court and Jury the following:

**PARTIES, VENUE, AND JURISDICTION**

1. This lawsuit concerns sexual exploitation of Plaintiff Gregory Valancius (hereinafter sometimes "Plaintiff") by Father Walter Emala (hereinafter sometimes "Emala"), an employee and agent of the Diocese of Nashville, from 1968-1969, when Plaintiff was a child. Plaintiff alleges herein that the Diocese of Nashville's tortious acts and omissions proximately caused severe emotional harm to Plaintiff.

2. Plaintiff is a 65-year-old resident of the State of Maryland.

3. At the time of the events described in this Complaint, Plaintiff was a minor, parishioner and altar boy at Our Lady Queen of Peace Parish (hereinafter sometimes "OLQP" in Middle River, Maryland, where Emala assisted in ministry.

4. Although OLQP was within the ecclesiastical jurisdiction of the Archdiocese of Baltimore (hereinafter sometimes the "Archdiocese"), Emala was employed by the Diocese, which knew of his history of and propensity to sexually abuse minors, as detailed more fully below.

5. Emala's service at OLQP was made possible by the fact that the Diocese never restricted his ability to act as a priest in good standing (i.e., to exercise his ministerial "faculties," meaning to act with the authority of a priest).

6. Defendant Catholic Diocese of Nashville is a religious corporation with its principal offices at 2800 McGavock Pike, Nashville, Tennessee.

7. As used herein, the terms "the Diocese" and "diocesan" should be understood as including and referring to Defendant Catholic Diocese of Nashville

8. At all relevant times, the Diocese has, among other activities, hired and supervised employees, including Emala, and owned and managed land, parishes, schools, and other affiliated entities in Tennessee.

9. At all relevant times, the Diocese was responsible for promulgating employment and personnel policies and procedures binding upon employees like Emala, including policies and procedures that are ostensibly meant to safeguard the well-being of children with whom diocesan employees come into contact, including Plaintiff.

10. The Diocese can be served via its religious leader, Bishop J. Mark Spalding, and the diocesan attorney, L. Gino Marchetti, Jr., among others.

11. Emala, who sexually assaulted Plaintiff, died on February 20, 2008.

12. Venue in the United States District Court for the Middle District of Tennessee is proper pursuant to 28 U.S.C.A. §1391, as Defendant Catholic Diocese of Nashville maintains its principal office in Davidson County and a substantial portion of the acts and omissions giving rise to the action occurred in Davidson County.

13. This Court has jurisdiction over this matter pursuant to its diversity jurisdiction under 28 U.S.C.A. §1332, as Defendant is a citizen of Tennessee and Plaintiff is a citizen of Maryland, and the amount in controversy in this action exceeds $75,000.

## STATEMENT OF FACTS AND ALLEGATIONS

**A. Emala's history in the Diocese and Archdiocese**

14. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

15. The Diocese ordained Emala as a priest in 1952.

16. At all relevant times, the Diocese employed Emala and had the right to control the location and nature of his employment, including the right to restrict and revoke his faculties to provide ministry as a priest in the Roman Catholic Church.

17. From 1952 through 1959, the Diocese of Nashville employed Emala as a priest in a variety of settings within the Diocese, where he had the occasion to come into frequent contact with children as part of his ministry. Emala served for short stints in multiple cities and locations. On information and belief, his transfers to new posts necessitated by his sexual misconduct toward minors.

18. In 1959, the Diocese placed Emala on "sick leave."

19. A handwritten 1959 letter from Nashville Bishop William Adrien to Emala indicated that the Diocese was aware of Emala's propensity to sexually abuse children. The letter stated in part, "As things stand now, we cannot entrust you with another pastorate in the diocese unless you radically change. And I am quite convinced that no pastor will accept you as an assistant except under command, and that I do not want to do…Also, your episode with that boy you were keeping around there was a scandal to many of your people."

20. Bishop Adrien noted in the letter that the Diocese had to pay $5,000 in bills as a result of Emala's conduct.

21. Notwithstanding the Bishop's letter, the Bishop or others acting at his direction at the Diocese placed Emala back into ministry in roles where he was certain to encounter minors. Emala served from 1960-1961 as a teacher at Immaculate Conception High School in Memphis

(away from his 1959 post as Pastor of St. Patrick Church in McEwen, Texas), from 1960-1967 as Assistant Pastor at Immaculate Conception High School in Memphis, TN, and from 1967-1968 as Assistant Pastor at St. Ann Church in Bartlett, TN.

22. In 1966, the Pastor of St. Ann in Bartlett, Tennessee, and the Director of Vocations wrote to Joseph Durick, the Apostolic Administrator, that Emala "seems to have an abnormal obsession regarding matters of their sex development and behavior… [Emala] takes young men on trips and insists on sleeping with them oftentimes in the nude. In these times, he tried to handle them in a sexual way."

23. Emala made boys train and weightlift in the nude while examining them. When parents of two boys threatened to speak out, the Pastor at St. Ann advised them to avoid Emala. Emala was confronted and refused to end his associations with the boys.

24. In April 1968, Durick wrote to Emala and said he could either take an extended leave of absence outside of Tennessee and keep his faculties or retire and lose them.

25. Emala chose to take a leave of absence outside of Tennessee and retain his faculties. He moved to Maryland, where he began assisting at OLQP.

26. On information and belief, the Diocese knew Emala had moved to Maryland and was assisting at OLQP.

27. From 1968-1970, the Diocese and the Archdiocese engaged in a joint venture/joint enterprise with regard to the work performed by Emala at OLQP. They shared a common purpose of having Emala work at OLQP, as it provided assistance to the Archdiocese and reduced the risk of harm to the image and reputation of the Diocese from further misconduct by Emala in Tennessee. The Diocese and the Archdiocese reached an express or implied agreement that Emala, while still a priest of the Diocese, would perform work at OLQP. Both the Diocese and the Archdiocese had the right to control Emala and the joint venture they engaged in with respect to him.

28. All references to the "Diocese" throughout this Complaint include the Diocese of Nashville; its agents, servants, employees, and any acting on its behalf; and the aforementioned joint venture/joint enterprise it maintained with the Archdiocese of Baltimore with respect to Emala.

29. Parishioners of OLQP, including Plaintiff and his parents, were third-party beneficiaries of the joint venture/joint enterprise between the Diocese and the Archdiocese.

30. In 1971, the Diocese of Memphis was formed out of the Diocese of Nashville.

31. In 1971, Emala requested permission from the Diocese of Memphis to seek an assignment in the Archdiocese of Baltimore and the opportunity to seek incardination in the future. Memphis Chancellor Leo Ringwald wrote to him on May 27, 1971, and granted him permission for extended sick leave and permission to apply to the Archdiocese of Baltimore for an assignment and after a year, for incardination. He wrote "you are in good standing in the Diocese of Memphis and still have the faculties of the diocese." In 1972, contingent on Ringwald's letter of good standing, Emala was appointed Temporary Associate Pastor of Our Lady Queen of Peace.

32. The Archdiocese received numerous other reports about Emala's sexual abuse and exploitation of boys.

33. After receiving reports in 1975 about Emala's behavior with multiple boys, then-Archbishop Borders of the Archdiocese of Baltimore terminated Emala's faculties in 1975 for "reasons of health." The real reason was child sexual abuse. Thereafter, Emala was only able to celebrate the sacraments in the Archdiocese with express archdiocesan permission.

34. Emala is listed as a perpetrator in the Maryland Attorney General Report on Child Sexual Abuse in the Archdiocese of Baltimore, which was first released to the on April 5, 2023.

35. The Archdiocese of Baltimore declared bankruptcy on September 29, 2023, and, as a result, may not be sued in tort or joined in this litigation.

**B. Emala's sexual exploitation of Plaintiff**

36. From 1968–69, Plaintiff was a victim of multiple incidents of sexual abuse while he was a minor by Fr. Walter Emala at or around Our Lady Queen of Peace Parish ("OLQP") in Middle River, MD.

37. Plaintiff served as an altar boy at OLQP from 1965–1971. He attended church regularly and went to a Catholic grade and middle school. Plaintiff's family was devoutly Catholic and expected Plaintiff to be respectful and reverent towards all Catholic clergy members at all times.

38. Plaintiff had been raised to honor and revere priests and clergy and was taught by the Roman Catholic Church and the Archdiocese that a priest was a representative of God or *alter Christus* ("other Christ"). The Diocese knew of and encouraged or acquiesced in this representation, which was made in the course of and enabled by its joint venture/joint enterprise with the Archdiocese with respect to Emala.

39. Plaintiff believed that the authority, direction, and instruction from the Catholic Church, promulgated through its instrumentalities (such as the Diocese and Archdiocese) and its agents (such as Emala), was doctrinally infallible.

40. Plaintiff placed his trust and confidence in the Roman Catholic Church, directly and by and through its instrumentalities and agents, including the Archdiocese, Diocese, and Emala, thereby placing the Diocese and Archdiocese in a position of influence and superiority over him.

41. As part of his service as an altar boy, Plaintiff assisted Father Emala with delivering envelopes to parishioners for donations to the church.

42. Plaintiff and Emala typically delivered these envelopes on Fridays and Saturdays.

43. On one occasion in 1968 or 1969, after he had been an altar boy for two to three years, Plaintiff slept over at Emala's home after delivering on Friday so they could get an early start delivering the envelopes on Saturday.

44. Plaintiff remembers walking into Emala's home and seeing two adults sitting at a table. They said nothing to him except "hello" and were unfriendly.

45. Father Emala showed Plaintiff to the bedroom where he would be sleeping. The lights were out, but Plaintiff noticed a great many liquor bottles on the bureau. Plaintiff took off his clothes and went to sleep.

46. In the middle of the night, Emala came into the room where Plaintiff was sleeping, lay down next to him, and pressed his naked body very tightly against him.

47. Emala then pulled Plaintiff's underwear down and began bumping and grinding against him, in a traumatic and painful fashion.

48. Emala eventually left but came back later that same night and sexually exploited Plaintiff again in the same fashion.

49. The next day, Emala and Plaintiff delivered the envelopes as scheduled. Emala did not discuss what had happened.

50. Emala also abused and exploited Plaintiff in the sacristy when Plaintiff was approximately 10 years old, in 1968 or 1969.

51. On these occasions, as Plaintiff was changing his clothes and putting on his cassock and surplice, Emala would press his face into Plaintiff's genitals and would rub Plaintiff's head with his stubbly chin. Plaintiff tried to wriggle away while he was being abused.

52. Emala's conduct, enabled by the negligent or intentional conduct of the Diocese, as further described herein, caused Plaintiff to suffer severe and lasting damages, including emotional harm, mental anguish, severe depression, stress-induced chronic illness arising from the abuse, PTSD, violent and intrusive thoughts, nightmares, flashbacks, fear and mistrust of authority figures, and inability to engage in normal, healthy emotionally and physically intimate relationships.

## TOLLING OF ALL APPLICABLE PERIODS OF LIMITATION AND TIME BARS

### A. Tolling Based on the Discovery Rule

53. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

54. Plaintiff did not know of the Diocese's potential liability for the conduct of Emala that resulted in him being physically and sexually abused until becoming aware of the content relative to Emala in the Maryland Attorney General's Report on Child Sexual Abuse in the Archdiocese of Baltimore (the "Report"), first released to the public on April 5, 2023.

55. Plaintiff was not aware of the content of the Report pertaining to Emala until after April 5, 2023.

56. Plaintiff did not know of the Diocese's employment of Emala, its role in and responsibility for Emala coming to and working at OLQP, until after becoming familiar with the contents of the Report after April 5, 2023.

57. Plaintiff did not know, and using reasonable care and diligence could not be expected to know, that the Diocese was responsible for Emala being present at OLQP and that the Diocese's acts and omissions were a proximate cause of, or in any way connected to, the sexual abuse he suffered at the hands of Emala. Even had he known that Emala had been employed by the Diocese (which he was not), inquiries to the Diocese regarding whether Emala had a history of sexual abuse would have been futile, as the Diocese's conduct indicated an implacable intent, over decades, to keep Emala's misconduct secret.

58. Plaintiff reasonably believed that Emala was and had always been a priest of the Archdiocese of Baltimore until the release of the Report.

59. All causes of action alleged herein did not accrue, and no period of limitations or time bar commenced, prior to April 5, 2023, when the Report was released.

## B. Tolling Based on Fraudulent Concealment

60. At all relevant times, Emala was an agent and employee of Defendant Diocese.

61. Defendant Diocese employed Emala at St. Ann's prior to his arrival at OLQP in Middle River, Maryland.

62. Emala continued to be an agent and employee of the Diocese while serving at OLQP until at least 1971.

63. From 1968-1971, the Diocese and the Archdiocese engaged in a joint venture/joint enterprise with regard to the work performed by Emala at OLQP. They shared a common purpose of having Emala working at OLQP, as it provided needed parish management and ministerial assistance to the Archdiocese and reduced the risk of harm to the image and reputation of the Diocese from further misconduct by Emala in Tennessee. The Diocese and the Archdiocese reached an express or implied agreement that Emala, while still a priest of the Diocese, would perform work at OLQP. Both the Diocese and the Archdiocese had the right to control Emala and the joint venture they engaged in with respect to him.

64. Plaintiff had a fiduciary relationship with the Diocese, Archdiocese, and the joint venture/joint enterprise between them, which created a duty on the part of the Diocese to disclose material facts to Plaintiff relevant to the causes of action below and to not conceal material facts relating to Plaintiff's causes of action herein.

65. The Diocese recognized Emala had sexually assaulted minors and was at continuing great risk of sexually abusing minors. Nonetheless, rather than removing his faculties, it gave him the option to retain his faculties should he take an extended leave of absence outside Tennessee, to keep the matter quiet and preserve its reputation and ensure the continuing flow of donations.

66. Emala moved to Maryland in order to keep his faculties and came to work at Our Lady Queen of Peace Parish.

67. The Diocese did not inform the Archdiocese, OLQP, or other instrumentalities or agents of the Archdiocese of Emala's misconduct. Had they informed the Archdiocese or OLQP, the Archdiocese would not have permitted Emala to enter ministry and work at OLQP and would not have sexually abused Plaintiff.

68. At all relevant times, the Diocese fraudulently concealed information of Emala's acts of sexual abuse against Plaintiff and other children in Tennessee and Maryland.

69. Emala repeatedly committed criminal acts of sexual assault against Plaintiff.

70. The Diocese knew that Emala was at risk of committing sexual abuse and misconduct toward children at Our Lady Queen of Peace Parish, before Plaintiff encountered him.

71. The Diocese concealed Emala's abuse, sexual misconduct, and sexual harassment of Plaintiff and others, by hiding the abuse from staff at Our Lady Queen of Peace Parish and parishioners; providing false information about his actions and moral character; quietly transferring Emala to a new posting to prevent further complaints and legal filings; failing to report Emala's abuses to police, child protective services, and other appropriate authorities; and by failing to reach out to Emala's prior victims, including Plaintiff, to disavow Emala's behavior and offer aid to those he sexually abused, including Plaintiff.

72. At all times prior to and following the sexual abuse of Plaintiff committed by Emala, the Diocese actively misrepresented, concealed and withheld material facts from the laity of the Diocese, including Plaintiff, regarding numerous complaints and substantiated findings of Emala committing misconduct of a sexual nature in the Diocese.

73. Defendant misrepresented, concealed, and withheld these materials with the intent of concealing the abuse, concealing their role in enabling the sexual abuse of children and for the purpose of preserving the reputation of the Diocese and the Roman Catholic Church in general.

74. Further, the Diocese's concealment was meant to quiet and subdue complaints of

sexual abuse and prevent valid legal filings against the entity.

75. The Diocese's fraudulent concealment of Emala's abuse consisted of silence and affirmative acts that were intended to, and had the effect of, lulling Emala's victims, including Plaintiff, into delay and prevent them from discovering their cause of action against the Diocese.

76. As a direct and proximate result of the Diocese's conduct as described herein, it is estopped from asserting any statute of limitation and/or statute of repose defenses which it may claim is applicable to this Complaint.

77. Applicable statute(s) of limitations are tolled because the Diocese has purposefully concealed Emala's sexual misconduct and sexual abuse from law enforcement, Plaintiff and his family, members of the church and surrounding community, and other individuals who had the authority to stop the abuse from occurring or intervene to stop the abuse once it began.

78. The statute of limitations and statute of repose are also tolled because the Diocese breached its duty to Plaintiff by negligently failing to ameliorate the severe, disabling mental and emotional harm it knew or should have known that Plaintiff experienced as a result of sexual abuse by Emala.

79. All causes of action alleged herein did not accrue, and no period of limitations or time bar commenced, prior to April 5, 2023, when the Report was released.

80. By virtue of this continuing victimization of Plaintiff and breach of its fiduciary relationship with him, the Diocese is estopped from raising the defenses of expiration of the statute of limitations and expiration of the statute of repose.

81. Plaintiff will be wrongfully and unjustly prejudiced by the misrepresentations and concealment committed by the Diocese if the statute of limitations or statute of repose is invoked to bar his claim.

## COUNT I
## NEGLIGENCE AND NEGLIGENCE PER SE

82. Plaintiff incorporates by reference all of the preceding paragraphs as if fully set forth at length herein.

83. At all relevant times, the Diocese concealed instances of child sexual abuse and complaints by victims.

84. At all relevant times, the Diocese zealously maintained secrecy concerning rampant child sexual abuse by diocesan clergy and employees by, among other tortious acts and omissions:

a. Failing to disclose complaints to law enforcement officials, parishioners and the public;

b. Maintaining secret archives and files of evidence of sex abuse, accessible only to the bishop and his designee;

c. Destroying incriminating documents and spoliation of evidence regarding sexual abuse by diocesan employees;

d. Transferring sex offending clergy and other employees, including Emala, to facilities in other locations where their pasts would not be known to parishioners, and the abusers would have a "fresh start" with a new group of vulnerable children;

e. Threatening and coercing victims and their families to withdraw complaints and retract allegations of sexual abuse;

f. Paying "hush money" to victims and their families, in exchange for promises of non-disclosure and confidentiality.

85. From 1968-1969, Plaintiff was sexually molested, or otherwise abused and mistreated by Emala on numerous occasions.

86. These actions taken by Emala occurred due to the Diocese of Nashville's ultimatum to Emala to either transfer to another Diocese or lose his faculties, its failure to inform the

Archdiocese of Emala's history of sexual misconduct and risk to children, its failure to warn parishioners at OLQP of Emala's misconduct and his risk to children, and its ongoing failure to supervise and discipline Emala before and after his posting at OLQP. The Diocese had the right to revoke Emala's faculties, which would have prevented him from serving at OLQP, but chose not to do so.

87. Emala's tortious conduct toward Plaintiff was within the scope of his relationship with the Diocese because they occurred or were made possible by that relationship (including the grooming and sexual abuse of Plaintiff and other individuals that Emala perpetrated), and were ratified expressly or impliedly by the Diocese.

88. The Diocese ratified Emala's conduct by declining to discipline him for his inappropriate conduct toward and sexual abuse of Plaintiff, and by enabling him through its inaction to continue to sexually abuse Plaintiff under the guise of offering spiritual guidance. The Diocese chose not to report Emala to authorities, declined to remove his faculties, and declined to discipline him, although it knew of Emala's misconduct toward and abuse of minors.

89. The Diocese, by and through its agents, servants, and/or employees, knew or reasonably should have known of Emala's sexual interest in children and misconduct and abuse of children; and that Emala was capable of committing immoral and criminal acts upon Plaintiff and other children. The abuse, assault, and damages suffered by Plaintiff at the hands of Emala were eminently foreseeable by the Diocese before they occurred.

90. At the time that Emala abused Plaintiff, Plaintiff and his family were unaware of the Diocese's knowledge of Emala's inappropriate behavior and sexual interest in children.

91. Plaintiff and his family were misled by the Diocese with regard to the Diocese's knowledge of Emala's history and propensity for committing sexual abuse and misconduct.

92. The Diocese had a duty to protect Plaintiff, whether he was a parishioner within its

Diocese or not.

93. During the time that Plaintiff was at OLQP, the Diocese owed Plaintiff, a minor child, a special duty to care for him as a reasonably prudent parent would care for him.

94. As such, the Diocese also owed Plaintiff a duty to protect him against unreasonable physical harm including any harm foreseeably caused by a third party.[1]

95. The Diocese was under a duty to exercise reasonable care so to control the conduct of Emala and prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them.

96. The Diocese empowered Emala to transfer his ministry to the Archdiocese despite its knowledge of Emala's pedophiliac nature. The Diocese failed to warn Plaintiff, his parents, or parishioners of the danger Emala posed. It thus exposed Plaintiff to Emala's proclivity for sexual assault and thereby caused Plaintiff physical injury.

97. In the alternative, the Diocese also failed to adequately warn the Archdiocese of Emala's propensity to sexually abuse children.

98. Before Emala's sexual abuse of Plaintiff began, the Diocese knew or should have known that Emala posed a serious risk to the physical safety to Plaintiff and other children.

99. It was foreseeable that Emala would physically injure children such as Plaintiff, because, among other reasons, the Diocese knew or should have known that he had sexually abused children and otherwise committed sexual misconduct at one or more of his prior postings.

100. Furthermore, the Diocese knew or had reason to know that Emala sexually abused children, including Plaintiff, and caused them bodily harm. Plaintiff and other children were in

[1] Restatement (Second) of Torts § 314A (1965).

danger of future harm and were helpless due to their age, Emala' status as a person in parish leadership, and the physical and emotional injuries they suffered from Emala's conduct, which was directly and proximately caused the Diocese's negligent, reckless, and intentional conduct described herein. The Diocese had a continuing duty to exercise reasonable care to prevent such further injury.

101. The Diocese's failure to exercise reasonable care increased the risk of harm to Plaintiff and other children. Families and children, including Plaintiff and his parents, relied on the Diocese and Emala and suffered due to their reliance and the Diocese's breach of duty.

102. The Diocese systematically breached its duty to Plaintiff in all of the aforementioned ways, and by:

a. Negligent performance of its undertaking in ordaining and employing Emala, and permitting and empowering his ministry in Maryland;

b. Failing to fire and report Emala;

c. Empowering and enabling Emala to be transferred to OLQP to a position that involved extensive work with children, without removing his faculties, despite the fact that the Diocese knew or should have known that Emala had abused and would likely continue abusing children.

d. Enabling Emala to have unrestricted access to children and placing him in a position of trust and control despite knowing he had a propensity to sexually abuse Plaintiff and other children;

e. Failing to warn Plaintiff, his family, other parishioners, the Archdiocese and the community of Emala's criminal sexual proclivities and the dangerous conditions his behavior created;

f. Failing to prevent Emala from committing physical and psychologically abusive acts upon Plaintiff;

g. Failing to properly adopt and enforce child sexual abuse reporting, prevention, intervention and investigation protocols within the Diocese and comply with applicable child sexual abuse reporting laws and other requirements;

h. Failing to monitor for and subsequently investigate allegations of sexual, physical and psychological abuse committed by any employee, volunteer or agent of the Diocese;

i. Failing to timely notify law enforcement, government, and child protection agencies of allegations of child sexual abuse against employees and other actual or apparent agents of the Diocese;

j. Failing to provide a safe environment where children were not subjected to sexual and psychological abuse;

k. Holding Emala out as being an individual of moral and ethical repute;

l. Failing to terminate Emala's employment and faculties, and failing to impose any meaningful sanction on his behavior, after it knew or should have known that he had sexually abused one or more children;

m. Failing to comply with statutes, rules, regulations, and ordinances enacted for one or more classes of persons that include Plaintiff (e.g., children, and victims of sexual abuse), enacted to prevent injuries of the type sustained by the Plaintiff, which imply a private right of action or impose liability under a negligence per se theory, including but not limited to statutes and regulations imposing a duty on the Diocese to report abuse committed by Emala to law enforcement and state authorities;

n. Negligent entrustment in permitting Emala to use his position in and faculties granted by the Diocese to engage in the sexual abuse, and assault and battery of children, including Plaintiff, when the Diocese knew or should have known that Emala was likely to use his position, made possible by the Diocese and the joint

venture/joint enterprise between the Diocese and Archdiocese, to abuse Plaintiff and other children;

o. Acting negligently under legal theories articulated in Restatement (Second) of Torts §§ 310–11, 313, 314A, 319, and 321, among others;

p. Violating policies and procedures that reflected the standard of care; and

q. Other negligent acts and omissions that may be disclosed during the course of discovery.

103. Through each of these negligent acts and omissions, the Diocese acted in reckless disregard of the safety of Plaintiff and knew or had reason to know of facts which would lead a reasonable person to realize, not only that their conduct created an unreasonable risk of physical harm to Plaintiff and other children, but also that such risk was substantially greater than that which is necessary to make their conduct negligent.

104. It was reasonably foreseeable that if the Diocese did not adequately exercise the duty to provide reasonable care to children, including but not limited to Plaintiff, the children entrusted to Diocese where Emala worked, would be vulnerable to sexual abuse.

105. The failure of the Diocese to protect Plaintiff from the foreseeable harm of Emala's sexual, physical, and psychological misconduct was committed with negligence, gross negligence, wanton recklessness, or reckless indifference to Plaintiff.

106. Each of the aforementioned negligent acts and omissions committed by the Diocese directly and proximately caused Plaintiff to sustain severe and permanent damages as described in paragraph 52.

WHEREFORE, Plaintiff demands judgment for damages against Defendants, in an amount exceeding the monetary jurisdictional limits of any and all lower courts that would otherwise have jurisdiction and to be determined upon trial of this action, together with interest, costs, and any other

appropriate relief.

## COUNT II

## NEGLIGENT SUPERVISION and RETENTION

107. Plaintiff incorporates by reference paragraphs 1 through 81 as though fully set forth at length herein.

108. Supervision of agents, servants, and employees within the Diocese's control was mandatory and created an unqualified duty upon it.

109. The Diocese, directly and by and through its actual or apparent agents, servants, and employees, undertook or otherwise had a duty to engage in reasonable supervision, monitoring, and retention of any employees, agents or representatives, including Emala, who interacted with children, held positions that brought them within close proximity of children, or accepted responsibility for children.

110. The Diocese, directly and by and through its actual or apparent agents, servants, and employees, knew or reasonably should have known of Emala's sexual interest in children, his sexual, physical, emotional and psychological violence upon victims before Plaintiff, and that he was capable of committing sexual, physical, emotional and psychological violence against Plaintiff and others.

111. The Diocese failed to properly observe, supervise, and monitor areas and individuals where it was known, knowable, or foreseeable that vulnerable children could fall victims of sexual, physical, emotional and psychological abuse without proper supervision.

112. The Diocese systematically breached its duty to Plaintiff by:

a. Failing to protect Plaintiff from abusive conduct by Emala;

b. Failing to properly monitor and supervise Emala;

c. Failing to force Emala to resign his position and faculties;

d. Failing to institute an effective child sexual abuse reporting process, intervention protocols, investigative procedures, and procedures to follow upon a substantiated finding of abuse;

e. Failing to prevent Emala from committing psychologically and sexually abusive acts upon Plaintiff;

f. Failing to monitor for and subsequently investigate acts of sexual, physical, emotional and psychological abuse and immoral conduct committed by any employee including Emala;

g. Failing to provide a safe environment where children are protected from sexual abuse;

h. Failing to promptly remove Emala from all interaction with children, including Plaintiff, after initial allegations that Emala was acting inappropriately with children;

i. Failing to sufficiently punish, reprimand, remove or dissuade Emala from continuing to sexually abuse children; and

j. Other acts and omissions that may become apparent during the course of discovery.

113. The Diocese's negligent supervision, negligent retention, and negligent failure to protect Plaintiff from the foreseeable harm of Emala's sexual, physical, emotional, and psychological abuse was a result of negligence, gross negligence, wanton recklessness, or reckless indifference to Plaintiff.

114. Each of the Diocese's aforementioned negligent acts and omissions relative to monitoring, supervision, and retention of Emala directly and proximately caused Plaintiff to sustain severe and permanent damages as described in paragraph 52.

WHEREFORE, Plaintiff demands judgment for damages against Defendants in an amount exceeding the monetary jurisdictional limits of any and all lower courts that would otherwise have

jurisdiction, in amounts to be determined upon trial of this action, together with interest, costs, and any other appropriate relief.

## COUNT III
## NEGLIGENT TRAINING

115. Plaintiff incorporates by reference paragraphs 1 through 81 as if fully set forth at length herein.

116. At all times material to this action, the Diocese was responsible for the training and education of its employees, agents and/or representatives, and parishioners pertinent to the recognition of, monitoring for, and prevention of child sexual abuse.

117. Despite the Diocese's knowledge that sexual abuse of children was being perpetrated by its actual and apparent agents, servants, and employees (including Emala), the Diocese failed to take preventative and reactive measures in the form of training to address systemic problems of training and supervision of clergy and parish staff.

118. The Diocese failed to sufficiently train and educate with respect to Emala's sexual abuse of children, including Plaintiff, by:

a. Failing to educate and inform parishioners, clergy, and other members of the church that sexual abuse may have occurred or was at risk of occurring;

b. Failing to educate and train church leaders, including vicars, bishops, diocesan administrators, and other supervisory personnel, as to how to detect, prevent, monitor for, report and investigate child sexual abuse within the Diocese;

c. Failing to educate and train employees, agents, servants and representatives, including priests, as to how to detect, prevent, monitor for and report child sexual abuse;

d. Failing to educate and train priests and other members of the clergy on how to

establish appropriate boundaries and relationships with children;

e. Failing to train Emala as to how to maintain appropriate professional boundaries with Plaintiff and other children;

f. Failure to train its agents on the criteria for revocation of faculties, termination of employment, and reporting of information concerning Emala's ministry to host dioceses for its personnel, such as the Archdiocese of Baltimore; and

g. Other acts and omissions as may become apparent during the course of discovery.

119. The failure of the Diocese to protect Plaintiff from the foreseeable harm of Emala's sexual, physical, emotional, and psychological abuse by providing sufficient training was as a result of negligence, gross negligence, wanton, recklessness, and/or reckless indifference to Plaintiff.

120. Each of the Defendants' aforementioned negligent acts and omissions with respect to training directly and proximately caused Plaintiff to sustain severe and permanent damages as described in paragraph 52.

WHEREFORE, Plaintiff demands judgment for damages against Defendants in an amount exceeding the monetary jurisdictional limits of any and all lower courts that would otherwise have jurisdiction, in amounts to be determined upon trial of this action, together with interest, costs, and any other appropriate relief.

## COUNT IV
## BREACH OF FIDUCIARY DUTY

121. Plaintiff incorporates by reference paragraphs 1 through 81 as though fully set forth at length herein.

122. At all times material to this action, Plaintiff was entrusted by his parents to OLQP.

123. The Diocese was required to provide Plaintiff with physical care and protection in the same capacity as a reasonably prudent parent.

124. The Diocese also maintained a fiduciary relationship of trust and confidence with Plaintiff where the Diocese undertook to actively engage in fostering, promoting and safeguarding Plaintiff's spiritual well-being.

125. The Diocese had a special, fiduciary relationship with Plaintiff. Plaintiff believed that the authority, direction, and instruction from the Catholic Church through its leaders and authorities was doctrinally infallible.

126. The Diocese taught Plaintiff and others to view those in positions of authority at the parish as being entitled to special privileges exceeding freedoms an ordinary parishioner would be allowed. These teachings indicated Plaintiff to give Emala a high degree of respect and obedience.

127. The Diocese confided the performance of their duty to Plaintiff to Emala as its agent, employee and representative.

128. As an agent and representative of the Diocese, Emala deepened and affirmed the Diocese's fiduciary relationship with Plaintiff because he singled Plaintiff out and spent time with him under the guise of providing Plaintiff with spiritual guidance or acting in his capacity as a diocesan employee.

129. Plaintiff placed his trust and confidence in the Diocese and in Emala, as its agent and employee, thereby placing the Diocese in a position of influence and superiority over him.

130. In addition to the Diocese's duties *in loco parentis*, the fiduciary relationship between Plaintiff and the Diocese created an affirmative duty on the part of the Diocese to act in Plaintiff's best interest and to protect him, considering his age of minority and vulnerability at all times.

131. The Diocese was obligated to do the following, among other responsibilities it had toward Plaintiff:

132. Prevent Emala from being placed in a position where he could sexually assault and harass Plaintiff;

133. Provide notice and warning to Plaintiff and his parents that Emala had prior allegations against him and was reassigned due to those allegations;

134. Provide notice and warning to Plaintiff and his parents that Emala was acting inappropriately with Plaintiff in a manner suggesting he was committing or intended to commit sexual acts against Plaintiff;

135. Intervene to prevent Emala's sexual abuse of Plaintiff once it was discovered;

136. Reach out to Plaintiff after the abuse ended to disavow Emala's representations to Plaintiff that his abuse was in any way permissible;

137. Otherwise exercise its control to prevent and intervene in Emala's abuse of Plaintiff and ameliorate the devastating consequences of that abuse after it occurred;

138. Disclose its own negligence and wrongdoing to Plaintiff, including its tortious conduct in placing Emala in a position where he could sexually abuse Plaintiff, and in failing to act to prevent Emala's sexual abuse of Plaintiff;

139. Disclose to Plaintiff that he may have one or more causes of action against the Diocese;

140. Timely address the devastating effects of Emala's abuse on Plaintiff by offering or securing for Plaintiff emotional, spiritual, medical, and financial assistance, and holding Emala meaningfully accountable; and

141. Report Emala's abuse or suspicions of that abuse to local and state law enforcement and regulatory authorities.

142. As a fiduciary to Plaintiff, Emala was duty-bound to protect Plaintiff from harm while she was in his care, speak to him truthfully and without purposeful manipulation, and establish an appropriate relationship with Plaintiff as a supervisor and spiritual mentor. Emala breached his duty by, among other acts and omissions, raping, sexually abusing, and manipulating Plaintiff, and

failing to disclose the wrongfulness of his conduct to Plaintiff.

143. The Diocese was or should have been aware that Emala made misrepresentations to Plaintiff concerning the nature of his sexual abuse, and that he was using the Diocese's special relationship with its parishioners, invitees, and the wider community to influence Plaintiff and others into believing that the abuse was a necessary and allowable thing required or sanctioned by God, the Catholic faith, or a Catholic theology of love.

144. The Diocese's ratification of and silence about Emala's sexual abuse breached its duty to Plaintiff and fraudulently concealed Plaintiff's claims against the Diocese.

145. Plaintiff had no reason to suspect that the Diocese entered a scheme of concealment and fraud with Emala. Plaintiff believed that the Diocese would not tolerate conduct that was truly wrong, sinful and illegal and that Emala would not commit such wrongful acts.

146. Plaintiff was under no obligation to search for wrongdoing by the Diocese where he reasonably believed the Diocese would uphold their duties to act in Plaintiff's best interest and keep him safe.

147. The Diocese breached its fiduciary duties to Plaintiff for all the reasons previously stated.

148. By breaching its fiduciary duties, the Diocese directly and proximately caused Plaintiff to sustain severe and permanent damages as described in paragraph 52.

WHEREFORE, Plaintiff demands judgment for damages against Defendants in an amount exceeding the monetary jurisdictional limits of any and all lower Courts that would otherwise have jurisdiction, in amounts to be determined upon trial of this action, together with interest, costs, and any other appropriate relief.

## COUNT V
## CONSTRUCTIVE FRAUD

149. Plaintiff incorporates by reference paragraphs 1 through 81 as though fully set forth at length herein.

150. As described above, the Diocese had a fiduciary and confidential relationship of trust and confidence with Plaintiff.

151. Plaintiff's position in the relationship with the Diocese was one of subordinate weakness and dependence, whereas the Diocese was in a position of superior knowledge and influence. Accordingly, they did not deal on equal terms.

152. The Diocese betrayed the fiduciary duty owed to Plaintiff as a result of the relationship of trust and confidence, by failing to inform Plaintiff of Emala's dangerous nature, transferring Emala (whom it knew or should have known posed a risk to child parishioners and children present on church property) to Maryland, and by later failing to act to remove Emala after he was hired at OLQP.

153. The Diocese also betrayed the fiduciary duty owed to Plaintiff as a result of the relationship of trust and confidence, by failing to inform Plaintiff he had one or more causes of action against the Diocese for its misfeasance and nonfeasance concerning the retention and supervision of Emala and mishandling of complaints against Emala.

154. Further, the Diocese held itself out as an institution that would protect vulnerable children. Its failure to investigate, punish and remove Emala, and failure to protect the community from and seek to remedy the effects of his sexual abuse and misconduct, are examples of a course of conduct that had the intent and effect of deceiving and misleading Plaintiff and the public about the Diocese's focus on the protection of children and the well-being and safety of its parishioners and the communities it purported to serve.

155. The Diocese had an accumulation of critical knowledge of the sexual abuse of children by its employees and clerics, including Emala, which it kept from Plaintiff, his parents and the public.

156. Further, as mentioned above, the Diocese had specific knowledge that Emala had committed sexual misconduct prior to his placement at OLQP, but still falsely assured parishioners, including Plaintiff and his parents, and the general public that Emala was of sufficient moral and ethical representative of the Diocese.

157. Emala betrayed the fiduciary duty owed to Plaintiff as a result of a relationship of trust and confidence and conspired with the Diocese, by holding himself out as a moral and ethical individual and a representative of God while engaged in the systematic sexual abuse of Plaintiff.

158. The Diocese's aforementioned constructive fraud directly and proximately caused Plaintiff to sustain severe and permanent damages as described in paragraph 52.

WHEREFORE, Plaintiff demands judgment for damages against Defendants, in an amount exceeding the monetary jurisdictional limits of any and all lower courts that would otherwise have jurisdiction and to be determined upon trial of this action, together with interest, costs, and any other appropriate relief.

**COUNT VI**
**FRAUD**

159. Plaintiff incorporates by reference paragraphs 1 through 81 as though fully set forth at length herein.

160. The Diocese held Emala out and affirmatively represented that Emala was fit to serve at the church on behalf of the Diocese and was a person of good moral character and an appropriate person to provide children with spiritual guidance, mentoring, and supervision.

161. Plaintiff is informed and believes that in addition to this appointment, the Diocese published or caused to be published information for parishioners and the general public indicating

that Emala's transfer to OLQP was a normal or routine re-assignment and that Emala was a safe and qualified employee.

162. Additionally, with the knowledge of the Diocese, Emala held himself out as a pious and fit person who would obey the policies and procedures of the Diocese and would uphold the requisite moral and ethical values and protect the safety of children.

163. The representations made by the Diocese concerning Emala's fitness to serve as associate pastor of OLQP were false.

164. At all times material herein, the Diocese by and through its agents and employees, knew or should have known that these representations were false.

165. The Diocese, directly and by and through Emala and its leaders, agents and employees, made the following misrepresentations of fact, among others as set forth in this complaint and as may be disclosed during formal discovery in this action:

a. That Emala was fit to serve as a minister to young people;

b. That Emala was an appropriately trained employee who had agreed to comply with the policies, procedures, and code of conduct of the Diocese; and

c. That the Diocese had no knowledge or reason to know that Emala would sexually abuse Plaintiff or commit misconduct toward other parishioners and parish staff.

166. The Diocese engaged in extreme and outrageous conduct by appointing and retaining Emala in a leadership role, allowing him to transfer to another Diocese, and representing that he was fit to serve the community while concealing and withholding information about his history of sexual misconduct from the members of OLQP, including Plaintiff, him peers, and his parents.

167. Even after discovering that Emala sexually abused Plaintiff at OLQP and committed sexual misconduct against other individuals, the Diocese concealed Emala's actions and chose not to

investigate his conduct, make findings, impose appropriate discipline, and report to law enforcement.

168. Further, the Diocese concealed the abuse so as to not subject itself to legal action, "scandal," loss of financial support, or embarrassment due to the heinous nature of Emala's crimes.

169. The Diocese's aforementioned fraud directly and proximately caused Plaintiff to sustain severe and permanent damages as described in paragraph 52.

WHEREFORE, Plaintiff demands judgment for damages against Defendants, in an amount exceeding the monetary jurisdictional limits of any and all lower courts that would otherwise have jurisdiction and to be determined upon trial of this action, together with interest, costs, and any other appropriate relief.

**COUNT VII**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

170. Plaintiff incorporates by reference paragraphs 1 through 81 as though fully set forth at length herein.

171. The Diocese intentionally engaged in extreme and outrageous conduct by:

a. Falsely representing to its parishioners, the Archdiocese, and the general public that Emala was an individual with whom children, including Plaintiff, could safely interact;

b. Allowing Emala to spend time alone with Plaintiff on repeated occasions;

c. Failing to prevent Emala from sexually abusing Plaintiff despite reasonable knowledge that Emala was or would attempt to do so;

d. Failing to stop Emala from continuing to abuse Plaintiff;

e. Allowing Emala to be placed at OLQP, allowing him access to new, unsuspecting child victims;

f. Failing to inform Plaintiff and his parents that Emala's conduct was immoral and a crime, and failing to denounce his actions; and

g. Other tortious acts and omissions as may become apparent during the course of discovery.

172. The Diocese knew that there was a high probability that allowing Emala to move Diocese and placing Emala elsewhere, like at OLQP, would result in the sexual abuse of parishioner children, including Plaintiff.

173. As a result of the Diocese's intentional conduct, Plaintiff suffered severe emotional distress over a period of years and continues to suffer today.

174. The Diocese's aforementioned actions and extreme and outrageous conduct directly and proximately caused Plaintiff to sustain severe and permanent damages as described in paragraph 52.

WHEREFORE, Plaintiff demands judgment for damages against Defendants, in an amount exceeding the monetary jurisdictional limits of any and all lower courts that would otherwise have jurisdiction and to be determined upon trial of this action, together with interest, costs, and any other appropriate relief.

**COUNT VIII**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

175. Plaintiff incorporates by reference paragraphs 1 through 81 as though fully set forth at length herein.

176. The Diocese had a duty to Plaintiff to, among other things, avoid inflicting emotional distress on him, and to take affirmative steps to avoid having Emala inflict emotional harm on him.

177. The Diocese breached this duty by:

a. Falsely representing to its parishioners, the Archdiocese, and the general public that Emala was an individual with whom children, including Plaintiff, could safely interact;

b. Remaining silent as to Emala's history of and propensity for sexual assault, which allowed Emala to spend time alone with Plaintiff on repeated occasions;

c. Failing to prevent Emala from sexually abusing Plaintiff despite reasonable knowledge that Emala was or would attempt to do so;

d. Failing to stop Emala from continuing to abuse Plaintiff;

e. Knowingly failing to investigate Emala, failing to inform Plaintiff and his parents that Emala's conduct was immoral and a crime, and failing to denounce his actions; and

f. Other tortious acts and omissions as may become apparent during the course of discovery.

178. The Diocese either knew or should have known that there was a high probability that placing Emala elsewhere, such as at OLQP, would result in the sexual abuse of parishioner children.

179. Furthermore, the Diocese's repeated, patterned behavior of turning a blind eye to Emala's inappropriate conduct with Plaintiff was negligent.

180. As a result of the Diocese's negligent conduct, Plaintiff suffered severe emotional distress over a period of years and continues to suffer today.

181. Plaintiff has experienced and currently experiences severe depression, PTSD, violent and intrusive thoughts, nightmares, flashbacks, fear and mistrust of authority figures, and inability to engage in normal, healthy emotionally and physically intimate relationships.

182. The Defendant' aforementioned negligent conduct directly and proximately caused

Plaintiff to sustain severe and permanent damages as described in paragraph 52.

WHEREFORE, Plaintiff demands judgment for damages against Defendants, in an amount exceeding the monetary jurisdictional limits of any and all lower courts that would otherwise have jurisdiction and to be determined upon trial of this action, together with interest, costs, and any other appropriate relief.

## COUNT IX

## AIDING AND ABETTING

183. Plaintiff incorporates by reference paragraphs 1 through 81 as though fully set forth at length herein.

184. Emala repeatedly performed wrongful acts of sexual abuse against Plaintiff over approximately one year and caused him severe physical and emotional injury.

185. The Diocese aided Emala in battering Plaintiff and committing fraud against Plaintiff by:

a. Hiring and retaining Emala and thereby giving him the benefit of a respected and revered position in the Church that prevented parishioners and community members from questioning, confronting or challenging his actions;

b. Allowing Emala to move to another Diocese instead of removing his faculties from him, which effectively allowed him to assault Plaintiff and other children at OLQP;

c. Knowingly allowing Emala to have continuous and repeated access to children, including Plaintiff, despite the fact that the Diocese had received widespread reports of his misconduct;

d. Acknowledging that Emala was behaving in a highly inappropriate manner toward Plaintiff and still socializing and cordially communicating with him instead of voicing their disdain, displeasure and condemnation of his actions;

e. Purposefully refusing to report Emala's abuse to the police or civil authorities and thereby ratifying his actions;

f. Purposefully and knowingly giving Emala repeated access to children whom, he would foreseeably sexually abuse, including Plaintiff; and

g. Other acts and omission that may become apparent during the course of discovery.

186. The Diocese knew of the criminal, immoral, wrongful and abhorrent nature of Emala's actions, yet acted in concert with Emala to protect the reputation of the Diocese and to insulate itself from legal liability, by permitting and empowering Emala to take a position at OLQP with full faculties and authority to minister as a priest.

187. The Diocese knowingly and substantially aided Emala in his endeavor to sexually abuse Plaintiff by refusing to terminate and discipline him, and consistently placing him in circumstances in which he could prey on Plaintiff.

188. The Diocese knowingly cooperated with Emala's efforts to continue his abusive behavior and purposefully concealed Emala's abuse over a period of years, ratified his actions, and provided him with the ability to continue sexually abusing Plaintiff in the same manner.

189. The Diocese assisted Emala by refusing to reprimand, punish, remove and/or report him and knowingly provided him with the ideal venue, environment and atmosphere to commit horrific sexual abuses against Plaintiff.

190. But for the Diocese's aid and assistance, Emala would not have sexually abused Plaintiff. The Diocese's concealment of Emala's abusive behavior, failure to discipline and fire Emala, and failure to report Emala, effectively shielded Emala from repercussions or moral reproach and greatly assisted him in sexually abusing Plaintiff under the guise of conducting parish business.

191. Each of the aforementioned actions of the Diocese in aiding and abetting Emala's battery of Plaintiff and concealment of the illegal and immoral nature of his actions directly and

proximately caused Plaintiff to sustain severe and permanent damages as described in paragraph 52.

WHEREFORE, Plaintiff demands judgment for damages against Defendants, in an amount exceeding the monetary jurisdictional limits of any and all lower courts that would otherwise have jurisdiction and to be determined upon trial of this action, together with interest, costs, and any other appropriate relief.

## PRAYER FOR RELIEF

WHEREFORE, Defendants are not protected by any statutory cap on punitive damages because Tennessee's statutory cap on punitive damages is unconstitutional; and alternatively, Tenn. Code Ann. §29-39-104 is unconstitutional because it violates the right to a trial by jury enshrined in both the United States Constitution and the Tennessee Constitution;[2]

WHEREFORE, Plaintiff prays for the following relief for each and every cause of action above, in addition to any others that may be disclosed during the course of discovery:

192. That proper process issue and be served upon the Defendants, and the Defendants be required to appear and answer this Complaint within the time required by law;

193. That the Plaintiff be awarded fair and reasonable damages, including compensatory and punitive damages in an amount to be determined by the jury;

194. That the Plaintiff be awarded the costs of trying this action;

195. That this action be heard by a jury;

196. That costs of this action be taxed to the Defendants;

197. That prejudgment interest be awarded to the Plaintiff;

198. That the Plaintiff be awarded any and all such other and further relief as the Court

---

[2] The courts appear split on this issue. See, Lindenberg v. Jackson National Life Insurance Co., 912 F.3d 348 (6th Cir. 2018) (holding that Tenn. Code Ann. § 29-39-104 violates the individual right to a trial by jury); McClay v. Airport Mgmt. Servs., LLC, 596 S.W.3d 686, 693 n.6 (Tenn. 2020) (holding that Tenn. Code Ann. § 29-39-102 does not violate the right to trial by jury under the Tennessee Constitution).

deems proper; and,

199. That Plaintiff's right to amend this Complaint be reserved.

Respectfully submitted,

/s/ John Spragens
John Spragens
TN Bar No. 31445
Spragens Law PLC
311 22nd Avenue North
Nashville, TN 37203
Telephone: (615) 983-8900
Fax: (615) 682-8533
john@spragenslaw.com

Patrick Thronson (*to apply pro hac vice*)
pthronson@jjsjustice.com
Adina Katz (*to apply pro hac vice*)
JANET, JANET & SUGGS, LLC
Executive Centre at Hooks Lane
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
Telephone: (410) 653-3200
Fax: (410) 653-9030