IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **GREGORY VALANCIUS,** | ) | |
| | ) | |
| **Plaintiff** | ) | **Case No. 3:24-cv-00364** |
| | ) | **Judge Waverly D. Crenshaw, Jr.** |
| | ) | **Magistrate Judge Evans** |
| **vs.** | ) | |
| | ) | **Jury Demand** |
| **CATHOLIC DIOCESE OF NASHVILLE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CATHOLIC DIOCESE OF NASHVILLE'S MOTION FOR SUMMARY JUDGMENT

---

Defendant, Catholic Diocese of Nashville ("Diocese of Nashville"), by and through counsel, submits this Memorandum of Law in support of its Motion for Summary Judgment ("Motion") pursuant to Fed. R. Civ. P. 56.

## I. INTRODUCTION

This is a lawsuit for personal injury damages[1] that was filed by Plaintiff Gregory Valancius ("Mr. Valancius" or "Plaintiff") – a resident of the State of Maryland – against the Diocese of Nashville, based upon allegations of sexual abuse that are alleged to have occurred more than a half century ago, in 1968, by Father Walter Emala at Our Lady Queen of Peace Catholic Church, located in or near Baltimore, Maryland. Plaintiff did not file this lawsuit until March 29, 2024. *See* Doc. 1.

To be clear, the Diocese of Nashville denies any wrongdoing on its part and denies that it

[1] Plaintiff's lawsuit asserts the following causes of action, all of which claim bodily and/or psychological injury: (1) negligence, (2) negligent supervision and retention, (3) negligent training, (4) breach of fiduciary duty, (5) constructive fraud, (6) fraud, (7) intentional infliction of emotional distress, (8) negligent infliction of emotional distress, and (9) aiding and abetting.

is responsible for the criminal actions of Father Emala in the State of Maryland in 1968. However, this Motion does not ask nor require the Court to reach or otherwise decide the underlying merits of Plaintiff's factual allegations and claims against the Diocese of Nashville because all of Plaintiff's claims are time barred by the applicable statutes of limitations.

As set forth more fully below, the applicable statutes of limitations, as applied to the Diocese of Nashville in this case, are Tenn. Code Ann. §§ 28-3-104 and 28-1-106, which require that all actions based upon negligence and tort which result in "injuries to the person" must be commenced within one year of the date Plaintiff knew or could have reasonably discovered his injury or damage, or, in the case of a minor at the time the cause(s) of action accrue(s), within the applicable time of limitation once the person turns eighteen (18) years of age. The undisputed facts show that Mr. Valancius knew at the time of the alleged abuse that he had been injured and harmed by Father Emala. Further, no later than October 7, 1976, Mr. Valancius had actual notice and/or "inquiry notice" of his claims against the Diocese of Nashville, and no tolling doctrine is available to Plaintiff. Accordingly, all of Plaintiff's claims are time barred and the Diocese is entitled to summary judgment.

## II. MATERIAL FACTS.

Mr. Valancius alleges that in 1968, while Plaintiff was a parishioner and altar server at Our Lady Queen of Peace parish in the Archdiocese of Baltimore, Father Emala, while was serving as an associate priest at the parish, sexually assaulted and abused him. Plaintiff alleges that prior to his assignment at Our Lady Queen of Peace, Father Emala was employed by and affiliated with the Diocese in Nashville, Tennessee. Plaintiff's lawsuit contends that the Diocese of Nashville had prior knowledge of Father Emala's history of abuse and allowed Father Emala to take an extended leave of absence from the Diocese of Nashville 1968 and return to Maryland to live with

his parents.

It is undisputed that Mr. Valancius was born on October 7, 1958. *See* Defendant's Statement of Undisputed Facts ("SOUF"), No. 1. Plaintiff claims that he was sexually abused by Father Emala over the period of one month in the summer of 1968, while Plaintiff was a parishioner and altar server at Our Lady Queen of Peace parish in Baltimore County, Maryland. *Id.*, at No. 2. The abuse at issue is alleged to have occurred when Plaintiff was approximately 10 years of age.[2] *Id.*, at Nos. 1, 2.

It is also undisputed that Plaintiff knew, no later than when he turned 18 years of age in 1976, that he had suffered emotional injury and harm that was caused by the abuse alleged to have been committed against him by Father Emala in 1968. *Id.*, at No. 6. Plaintiff knew, no later than 1976, that at the time of his alleged abuse in 1968, Father Emala was an associate priest at Our Lady Queen of Peace parish in Baltimore County, Maryland. *Id.*, at No. 3. However, despite this knowledge, Plaintiff never disclosed his allegations of abuse against Father Emala to anyone from 1968 until 2023, when Plaintiff saw a television commercial from a Maryland personal injury law firm soliciting victims of clergy abuse. *Id.*, at 16.

Plaintiff's decision to not make any claim, report or otherwise disclose his alleged abuse prior to 2023 was not the result of any impediment – physical, mental or otherwise – that prevented him from coming forward or otherwise pursuing his claims against Father Emala between 1968 and 2023. *Id.*, at 15. Plaintiff was aware, based on public media reports, of lawsuits made by victims of clergy abuse as early as 2002, and he knew no later than 2003-2004, that Father Emala was a priest who had come to the Archdiocese of Baltimore from the Diocese of Nashville. *Id.*, at No. 4, 18. However, Plaintiff never made any effort to investigate or otherwise pursue any claim

[2] Plaintiff reached the age of majority - 18 years old - on October 7, 1976. *See* SOUF No. 1.

against anyone Plaintiff believed to be responsible for the alleged abuse Father Emala committed against Plaintiff between 1976 and 2023. *Id., at No. 4, 18.*

Prior to 2023, Plaintiff never made any inquiry or requested any information regarding Father Emala from Our Lady Queen of Peace parish, the Archdiocese of Baltimore, or the Diocese of Nashville prior to filing his lawsuit in 2023. *Id*., at Nos. 11-14. This was despite the fact that Father Emala had been publicly identified on a list of priests credibly accused of child sexual abuse published by the Archdiocese of Baltimore in 2002. *Id*., at No. 6. Father Emala was also publicly identified on lists of priests credibly accused of child sexual abuse published by the Diocese of Harrisburg and the Diocese of Nashville in 2018. *Id*., at Nos. 7, 8. The 2018 publication by the Diocese of Nashville of its list of priests credibly accused of child sexual abuse received considerable media coverage. *Id*., at Nos. 7, 8.

The Diocese of Nashville never misrepresented Father Emala's status or period of incardination in the Diocese of Nashville to any party and was never contacted by anyone, including but not limited to Plaintiff, regarding allegations of misconduct against Father Emala in the State of Maryland. *Id*., at Nos. 10, 11. Despite the undisputed fact that Plaintiff knew, no later than when he turned 18 years of age in 1976, that he had suffered emotional injury and harm that was caused by the abuse alleged to have been committed against him by Father Emala in 1968, Plaintiff did not file Complaint against the Diocese of Nashville until March 29, 2024. As set forth in detail below, the applicable statutes of limitations bar the entirety of Plaintiff's claims against the Diocese of Nashville in this case.

## III. LAW AND ARGUMENT.

### A. Standard of Review.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall

be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The substantive law will determine which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* "So long as the movant has met its initial burden of a demonstrat[ing] the absence of a genuine issue of material fact, 'the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) and Fed. R. Civ. P. 56(e)).

**B. Plaintiff's Claims Are Subject to Tennessee's Statutes of Limitations.**

Jurisdiction in this case is based upon diversity of the parties, and accordingly, the Court must apply "the choice-of-law rules of the forum state." *Muncie Power Prod. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003). In diversity cases, federal court apply state law to determine the relevant statute of limitations as well as the accompanying discovery rule. See Imes v. Touma, 784 F.2d 756, 758 (6th Cir. 1986).

Tennessee courts apply the statute of limitations of the forum as a "procedural" measure unless the action (1) is one encompassed by the state borrowing statute, Tenn. Code Ann. § 28-1-112, or (2) is one in which the foreign state's limitation is not merely upon the remedy but upon the underlying substantive right. *Mackey v. Judy's Foods, Inc.*, 654 F.Supp. 1465, 1469 (M.D.

Tenn. Feb. 10, 1987) (quoting *Whitfield v. City of Knoxville*, 756 F.2d 455 (6th Cir. 1985); *McDaniel v. Mulvihill*, 263 S.W.2d 759 (Tenn. 1953); *Bournias v. Atlantic Maritime Co.*, 220 F.2d 152 (2d Cir. 1955). A statute of limitation in a foreign jurisdiction is held "substantive" only when it is built into the same statute that creates the cause of action in question or when the limitation, though appearing in a different statute, is "directed to the newly created liability so specifically as to warrant saying that it qualified the right." *Mackey*, 654 F.Supp. at 1469 (quoting *Davis v. Mills*, 194 U.S. 451, 454 (1904).

Plaintiff's claims do not meet either of the above criteria. First, Tenn. Code Ann. § 28-1-112 "borrows" another state's statute only to bar actions that accrue while the "party to be charged" is resident in the foreign state. In this case, the State of Maryland eliminated its statute of limitations for child sexual abuse cases via the enactment of the Maryland Child Victims Act of 2023, effective October 1, 2023. *See* Roman Catholic Archbishop of Washington v. Doe, 330 A.3d 1069, 1074 (Md. 2025). As such, there would be no foreign state bar to "borrow," which renders the borrowing statute, Tenn. Code Ann. § 28-1-112, inapplicable to this case. Second, the Maryland Child Victims Act of 2023 does not satisfy the *Davis-Bournias* criteria, as it does not create a new right, but rather extends the period for a right of action by its removal of statutes of limitations for cases related to child sexual abuse.

Accordingly, Tennessee law applies to determine the applicable statutes of limitation and the discovery rule for all claims in this case.

**C. Plaintiff's Claims Accrued on October 7, 1976.**

"The choice of the correct statute of limitations is made by considering the 'gravamen of the complaint.'" *Redwing v. Catholic Diocese of Memphis*, 363 SW 3d, 436, 457 (Tenn. 2012) (quoting *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006) (internal citations omitted). "In

common parlance, this rather elliptical phrase refers to the 'substantial point,' the 'real purpose,' or the 'object' of the complaint. *Id*. (internal citations omitted). The gravamen of Plaintiff's Complaint against the Diocese of Nashville is based in negligence and related torts. All the causes of action allege that the conduct complained of by Father Emala caused emotional injury to Mr. Valancius.

Accordingly, Plaintiff's causes of action are governed by the one-year statute of limitations found in Tenn. Code Ann. § 28-3-104. As Plaintiff was a minor at the time of the alleged abuse, Tenn. Code Ann. § 28-3-106 establishes that the applicable period is within one year from the date she turned eighteen (18) years of age – in this case, October 7, 1976.

As stated by the Tennessee Supreme Court in *Redwing,* 363 SW 3d at 456 (internal citations omitted):

> Statutes of limitations promote fairness and justice. [] They are shields, not swords, [], and they reflect "'a societal choice that actions must be brought within a certain time period.'" [] They are based on the presumption that persons with the legal capacity to litigate will not delay bringing suit on a meritorious claim beyond a reasonable time. [].
>
> We have frequently pointed out that statutes of limitations (1) promote stability in personal and business relationships, [], (2) give notice to defendants of potential lawsuits, [], (3) prevent undue delay in filing lawsuits, [], (4) "avoid the uncertainties and burdens inherent in pursuing and defending stale claims," [], and (5) "ensure that evidence is preserved and facts are not obscured by the lapse of time or the defective memory or death of a witness," []. Accordingly, the courts construe exceptions to statutes of limitations carefully to assure that they are not extended beyond their plain meaning. [].

*Id*.

Although Plaintiff has argued in his Complaint the statute of limitation should be tolled as he was not aware of the Diocese of Nashville's involvement with Fr. Emala prior to the Maryland Attorney General's publishing of their Report on Child Sexual Abuse in the Archdiocese of Baltimore ("the Maryland AG Report") in April 2023, Plaintiff's own deposition testimony in this

case tells a different story.

Q. Why do you believe the Diocese of Nashville is responsible for what happened to you in 1968?

…

A. He came to Baltimore from Nashville.

Q. And when did you learn that information?

A. Oh. That was years and years later.

Q. Ok. When did you first learn that information?

A. Sometime mid-2020s – 2000s.

Q. I want to make sure I got your answer correct on that. When did you first learn that Father Emala came from Nashville – Father Emala came from Nashville?

A. Around the mid to – early to mid 2000s.

Q. Early to mid 2000s?

A. Yeah. Like 2003, 2004. I don't remember exactly when. But it was when they were first coming out with stories about priests who abused children.

Q. How did you learn in the mid-2000s that Father Emala came from Nashville originally?

A. They stated it in the news media. Or it was printed in the inside story.

Q. When learning in the mid-2000s that Father Emala was a priest originally from Nashville through the news media, that didn't change your decision at the time not to pursue a claim?

A. At that time, no, it didn't.

Exhibit A, Valancius Dep., 53:2-25; 54:1-11.

Even had Mr. Valancius not admitted that he was aware of Fr. Emala's affiliation with the Diocese of Nashville in 2004 (which he did), Plaintiff's specific knowledge of the Diocese of Nashville's affiliation with Fr. Emala is not required under Tennessee's discovery rule. "Tennessee law is clear on this issue: whether Plaintiff had actual knowledge of the church's awareness is not the only inquiry in deciding when the statute of limitations began to run. Instead, the question is whether a "reasonable person in such circumstances ... should have discovered [his] actions against the [church] before expiration of its statute of limitations." *Jackson v. Kingdom Hall of Jehovah Witness*, No. 1:22-cv-01133, 2023 WL 2674181, at *3 (W.D. Tenn. Mar. 1, 2023) (citing *C.S. v. Diocese of Nashville*, 2009 Tenn. App. LEXIS 582, *9-10, 2008 WL 4426891 (Tenn. Ct. App. 2008); *see also Doe v. Catholic Bishop for the Diocese of Memphis*, 306 S.W.3d 712, 725-26 (Tenn.

Ct. App. 2008)). "Thus, Plaintiff did not need actual knowledge of the church's breach of duty to [him.] [H]e only needed to know some "facts sufficient to put a reasonable person on notice." *Id*. (quoting *Redwing*, 363 S.W.3d at 459 (internal citation omitted)).

Because Mr. Valancius knew that he had been abused, knew who his abuser was, and knew that he was a priest at the Our Lady Queen of Peace parish, he was on "inquiry notice" of his claims no later than 1976, when he obtained the age of majority. *See* Jackson, 2023 WL 2674181 at *3 (citing *Doe*, 306, S.W.3d at 725; s*ee also Jane Doe A*, 852 S.W.2d at 904). Plaintiff was on inquiry notice of his potential claims and was required to use reasonable means to discover any other alleged causes of actions which might exist or other person or entities who could be claimed to bear fault. A person who is injured and has inquiry notice of the nature of the act and the identity of possible defendants must use reasonable efforts to garner the information necessary as a reasonable basis for litigation. As quoted by the Tennessee Court of Appeals in *Doe v Catholic Bishop for Memphis*, 306 SW3d 712 (Tenn. App. 2009), "[t]he Plaintiff must go find the facts: he cannot wait for the facts to find him." *Id*., at 731 (internal citations omitted). Here, Plaintiff took no such actions in the half century between 1976 and 2023. For this reason, Plaintiff's claims are time barred under Tennessee law.

Courts have consistently rejected the argument that the limitations period should be tolled indefinitely until a plaintiff has identified every potentially liable party. A plaintiff cannot simply wait for information regarding a potential defendant to come to him before he is charged with inquiry notice. A plaintiff has a duty to investigate and discover pertinent facts "through the exercise of reasonable care and due diligence." *Calaway ex rel. Calaway v. Schucker,* 193 S.W.3d 509, 520 (Tenn. 2005). If a plaintiff's lack of knowledge was due to a lack of due diligence, he will not be allowed to plead ignorance and effectively extend the statute of limitations, by way of

the discovery rule, simply because he later discovered "new" information that he "reasonably should have discovered" much earlier. *Grindstaff v. Bowman*, No. E2007–00135–COA–R3–CV, 2008 WL 2219274 at *6 (Tenn. Ct. App. May 29, 2008); *Strine v. Walton*, 323 S.W.3d 480, 492 (Tenn. Ct. App. 2010).

This principle was reinforced in *Wagner v. International Automotive Components Group North America, Inc.*, 131 F.Supp.3d 746 (2015), holding the discovery rule only serves to toll a statute of limitations where there is a delay in the discovery of the actual injury, not where there is a delay in the discovery of the identity of additional tortfeasors.

> Under the "discovery rule" applicable in tort actions, ... the cause of action accrues and the statute of limitations begins to run when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered. The discovery rule applies only in cases where the plaintiff does not discover and reasonably could not be expected to discover that he had a right of action. Furthermore, the statute is tolled only during the period when the plaintiff had no knowledge at all that the wrong had occurred and, as a reasonable person, was not put on inquiry.

*Wagner*, 131 F.Supp.3d at 753 (quoting *Schultz v. Davis*, 495 F.3d 289, 292 (6th Cir. 2007) (citing *Potts v. Celotex Corp.*, 796 S.W.2d 678, 680-681 (Tenn. 1990)).

The *Wagner* court rejected the argument that a cause of action against each potential defendant does not accrue until the plaintiff discovers their identity, characterizing that reading as a vastly expansive interpretation of the discovery rule unsupported by the case law. *Id.*

### D. No Tolling Doctrines Apply.

#### 1. Fraudulent Concealment Does Not Apply.

The doctrine of fraudulent concealment as a basis to toll the applicable statute of limitations in not applicable in this case. As set forth by the Tennessee Supreme Court in *Redwing*:

> As it currently exists in Tennessee, the doctrine of fraudulent concealment is aligned with the discovery rule. Under the fraudulent concealment doctrine, the statute of limitations is tolled when "the defendant has taken steps to prevent the

> plaintiff from discovering he [or she] was injured." *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d [141,] 146 [(Tenn. 2001)]. While other decisions couch the fraudulent concealment doctrine in terms of the defendant taking affirmative steps "to conceal the cause of action," the reference to "cause of action" in this context is synonymous with the plaintiff's injury.

*Redwing*, 363 S.W.3d at 462.

> A claim of fraudulent concealment to toll the running of a statute of limitations contains four elements. The plaintiff invoking the fraudulent concealment doctrine must allege and prove: (1) that the defendant affirmatively concealed the plaintiff's injury or the identity of the wrongdoer or failed to disclose material facts regarding the injury or the wrongdoer despite a duty to do so; (2) that the plaintiff could not have discovered the injury or the identity of the wrongdoer despite reasonable care and diligence; (3) that the defendant knew that the plaintiff had been injured and the identity of the wrongdoer; and (4) that the defendant concealed material information from the plaintiff by "'withholding information or making use of some device to mislead' the plaintiff in order to exclude suspicion or prevent inquiry." … Plaintiffs asserting the doctrine of fraudulent concealment to toll the running of a statute of limitations must demonstrate that they exercised reasonable care and diligence in pursuing their claim. *See Vance v. Schulder*, 547 S.W.2d 927, 930 (Tenn. 1977); *Ray v. Scheibert*, [] 450 S.W.2d 578, 580-81 ([Tenn.] 1969).

*Id.*, at 462-463.

Plaintiff cannot carry this burden. There is no evidence in the record that the Diocese of Nashville took any action to conceal Plaintiff's injury or the identity of the wrongdoer or failed to disclose any material facts despite a duty to do so. The record shows that Plaintiff was aware of Father Emala's abuse, his affiliation with the Our Lady Queen of Peace parish, the Archdiocese of Baltimore and his prior affiliation with the Diocese of Nashville. Plaintiff affirmatively chose not to make any claim, report or inquiry about Father Emala prior to filing his lawsuit in 2023. Plaintiff never made any inquiry or requested any information regarding Father Emala from Our Lady Queen of Peace parish, the Archdiocese of Baltimore, or the Diocese of Nashville prior to filing his lawsuit in 2023. SOUF, at Nos. 11-14. Further, it is undisputed that the Diocese of Nashville never misrepresented Father Emala's status or period of incardination in the Diocese of Nashville to any party and was never contacted by anyone, including but not limited to Plaintiff,

regarding allegations of misconduct against Father Emala in the State of Maryland. *Id*., at Nos. 10, 11. Accordingly, the doctrine of fraudulent concealment does not apply to Plaintiff's claims.

**2. Equitable Estoppel Does Not Apply.**

"Equitable estoppel is premised on the defendant's wrongdoing, and, consequently, the plaintiff must be given the time during which the defendant misled the plaintiff so that plaintiff's entitlement to the full statutory time period is preserved." *Fahrner v. SW Mfg, Inc*., 48 S.W. 3d, 141, 146 (Tenn. 2001). As established in *Doe v Catholic Bishop for Memphis,* 306 SW3d 712, 721 (Tenn. App. 2009), in order to successfully rely on equitable estoppel, Plaintiff must show that the Diocese "(1) engaged in a false representation or concealment of material facts, (2) with knowledge, actual or constructive, of the real facts, and (3) with the intent or at least the expectation that its representation or concealment would be acted upon by the other party." *Id*. "The party asserting estoppel must also prove that [she] (1) relied on the false representation or concealment, (2) changed [her] position to [her] prejudice, and (3) lacked knowledge and the means of acquiring knowledge of the truth as to the facts in question." *Id*. (internal citations omitted).

The record is devoid of any evidence sufficient to satisfy these elements. Plaintiff himself has conceded that prior to filing his lawsuit 2023, Plaintiff never made any inquiry or requested any information regarding Father Emala from Our Lady Queen of Peace parish, the Archdiocese of Baltimore, or the Diocese of Nashville prior to filing his lawsuit in 2023. SOUF, at Nos. 11-14. Further, it is undisputed that the Diocese of Nashville never misrepresented Father Emala's status or period of incardination in the Diocese of Nashville to any party and was never contacted by anyone, including but not limited to Plaintiff, regarding allegations of misconduct against Father Emala in the State of Maryland. *Id*., at Nos. 10, 11. As such, the doctrine of equitable estoppel does not apply to this case.

## IV. CONCLUSION

For the foregoing reasons, the Diocese of Nashville respectfully requests that the Court enter summary judgment in its favor on each of the claims alleged by Plaintiff.

**DATED: June 30, 2026.**

Respectfully submitted,

GORDON REES SCULLY MANSUKHANI, LLP

By: *s/ Matthew C. Pietsch*
Matthew C. Pietsch, TN Bar No. 024659
Lindsey M. Shepard, TN BPR No. 34444
4020 Aspen Grove Drive, Suite 500
Franklin, TN 37067
Phone: 615-722-9000
Fax: 615-970-7490
mpietsch@grsm.com
lshephard@grsm.com

TAYLOR, PIGUE, MARCHETTI & BLAIR, PLLC

L. Gino Marchetti, Jr., TN Bar No. 005562
2908 Poston Avenue
Nashville, TN 37203
Phone: 615-320-3225
Fax: 615-320-3244
gmarchetti@tpmblaw.com

*Attorneys for Defendant Catholic Diocese of Nashville*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and complete copy of the foregoing has been served through the Court's electronic filing system to the following on **June 30, 2026**:

| | |
|---|---|
| Andrew S. Janet<br>Janet, Janet & Suggs, LLC<br>Executive Center at Hooks Lane<br>4 Reservoir Circle, Suite 200<br>Baltimore, MD 21208<br>Phone: 410-653-3200<br>Fax: 410-653-9030<br>asjanet@jjsjustice.com<br><br>John Spragens<br>Spragens Law PLC<br>311 22nd Ave. N.<br>Nashville, TN 37203<br>Phone: 615-983-8900<br>Fax: 615-682-8533<br>john@spragenslaw.com<br><br>*Counsel for Plaintiff* | Louis Gino Marchetti, Jr.<br>Taylor, Pigue, Marchetti & Blair, PLLC<br>2908 Poston Avenue<br>Nashville, TN 37203<br>gmarchetti@tpmblaw.com<br><br>*Counsel for Defendant* |

*/s/ Matthew C. Pietsch*