**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **GREGORY VALANCIUS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:24-cv-00364** |
| | ) | |
| **CATHOLIC DIOCESE OF NASHVILLE,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Nearly sixty years ago, Father Walter Emala—a priest for the Catholic Diocese of Nashville ("Diocese")—sexually abused Gregory Valancius while Emala served at a Catholic parish in Maryland. Valancius seeks to hold the Diocese liable for its knowledge of Emala's misconduct and the role it allegedly played in allowing Emala to continue ministering in Maryland and ultimately abuse him. The Diocese moves for summary judgment because that Valancius's claims are barred by the applicable statute of limitations. The motion is ripe for review. (Doc. Nos. 53, 54, 55, 56, 57). For the reasons below, it will be denied.

## I. Factual Background

Valancius was born on October 7, 1958. (Doc. No. 56-1 ("SUMF") ¶ 1). In the summer of 1968, Emala sexually abused Valancius over approximately one month while Valancius was a parishioner and altar server at Our Lady Queen of Peace Church in Baltimore County, Maryland. (Id. ¶ 2). By 1976, when Valancius turned eighteen years old, he knew that Emala had served as an associate priest at that parish. (Id. ¶ 3). Valancius also knew by then that Emala's abuse had caused him emotional injury. (Id. ¶ 5).

In 2002, the Archdiocese of Baltimore publicly identified Emala on a list of priests credibly accused of child sexual abuse. (Id. ¶ 6). The Diocese of Harrisburg and the Diocese of Nashville published similar lists identifying Emala in 2018. (Id. ¶¶ 7–8). Valancius did not report Emala's abuse of him until 2023. (Id. ¶ 16). Before that, he did not request any information concerning Emala from the Diocese, the Archdiocese of Baltimore, or Our Lady Queen of Peace. (Id. ¶¶ 12–14).

The parties dispute when Valancius learned of Emala's connection to Nashville and the Diocese. (Id. ¶ 4). The Diocese contends that Valancius learned from news reports by 2003 or 2004 that Emala had come to Baltimore from the Diocese of Nashville. (Id.) Valancius, on the other hand, contends that he first learned of the Diocese's role after April 5, 2023. (Id.)

The parties also dispute the scope of the publicity surrounding the Diocese's 2018 publication of its list of priests credibly accused of child sexual abuse. (Id. ¶ 9). The Diocese characterizes the media coverage as "considerable," while Valancius contends that the coverage was local to Tennessee and included no national or Baltimore-area coverage. (Id.)

Finally, the parties dispute what the Diocese disclosed about its historical knowledge of Emala. (Id. ¶ 10). The Diocese argues that it never misrepresented anything about Emala's tenure with the Diocese, while Valancius contends that the Diocese knew as early as 1959 of Emala's sexual conduct with minors and concerns about his fitness for ministry and never publicly disclosed those concerns. (Id.)

The Diocese pleaded the following affirmative defense:

> Plaintiff's Complaint asserts claims pertaining to allegations made against a priest concerning activity alleged to have occurred within the Archdiocese of Baltimore in the State of Maryland between 1968 – 1969, more than 55 years ago. The Diocese has received no notice prior to the filing of the Complaint nor has any information regarding the circumstances or nature of the alleged interactions between Plaintiff and the named priest between 1968 – 1969 in the State of

> Maryland. However, allegations against the named priest have, upon information and belief, been publicly made and reported on for more than the past 20 years, including in the States of Maryland, Pennsylvania and Tennessee. In addition, the named priest has been included on published lists of priests accused of sexual abuse by the Archdiocese of Baltimore, the Diocese of Harrisburg and the Diocese of Nashville for multiple years prior to the filing of Plaintiff's Complaint. Plaintiff's claims against the Diocese are barred by the applicable statute(s) of limitations and by the doctrine of laches.

(Doc. No. 26 at 18).

## II. Legal Standard

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). In deciding a motion for summary judgment, the Court reviews all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter, and instead determines only whether the evidence presented reveals a disputed material issue of fact for the jury to decide. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which the jury could reasonably find for the nonmoving party. Rodgers, 344 F.3d at 595.

A statute of limitations is an affirmative defense. "Where, as here, the defendant moves for summary judgment based on statute-of-limitation grounds, summary judgment is appropriate if the statute of limitations has run and there is no genuine issue of material fact as to when the

plaintiff's cause of action accrued." Swanson v. Wilson, 423 F. App'x 587, 592 (6th Cir. 2011) (citing Campbell v. Grand Trunk W. R. Co., 238 F.3d 772, 775 (6th Cir. 2001)). "The burden is on a defendant to show that the statute of limitations has run." Id. (citing Campbell, 238 F.3d at 775). "However, once the defendant carries that burden, the plaintiff has the burden to establish an exception to the statute, such as tolling or late discovery of the injury." Id. (citing Campbell, 238 F.3d at 775).

## III. Analysis

The Diocese's motion presents two questions: whether Tennessee's statute of limitations applies and, if so, when Valancius's claims accrued. The Court finds that Tennessee limitations law governs, but will deny the Diocese's motion because it has not carried its burden of showing that there is no genuine dispute of material fact about when Valancius's claims accrued.

### A. Tennessee's Statute of Limitations Applies

The Diocese argues that Valancius's claims are governed by Tennessee's one-year statute of limitations for personal-injury actions, Tenn. Code Ann. § 28-3-104(a)(1)(A), together with Tennessee's tolling provision for minors, id. § 28-1-106. (Doc. No. 55 at 5–7). Valancius responds that Maryland's Child Victims Act, Md. Code Ann., Cts. & Jud. Proc. § 5-117, supplies the applicable limitations period because Maryland made that provision part of a substantive right to recover for childhood sexual abuse. (Doc. No. 56 at 7–8).

"Federal courts sitting in diversity generally apply federal procedural rules and the substantive law of the forum state." Rupert v. Daggett, 695 F.3d 417, 423 (6th Cir. 2012). The Sixth Circuit has long treated a foreign jurisdiction's statute of limitations as procedural and therefore applied the forum State's limitations law. Whitfield v. City of Knoxville, 756 F.2d 455, 461 (6th Cir. 1985) (explaining that a trial forum "normally may ignore another jurisdiction's statute of limitations as being a procedural rule affecting only the remedy"). Under controlling

Sixth Circuit precedent, a foreign limitations period is substantive, and the district court should apply it, when the foreign jurisdiction "creates a new legal right unknown at common law" and ties the time limitation to that newly created right. Id. at 461–62. In that circumstance, the limitation operates as "a condition attached to the underlying substantive right" rather than a procedural restriction on the remedy. Id.; see also Logan v. MGM Grand Detroit Casino, 939 F.3d 824, 829 (6th Cir. 2019) ("[W]e have held that where 'the statute creating a cause of action also fixes a limitation of time in which an action may be brought, the limitation is regarded as a part of the substantive law of the cause of action.'" (quoting Myers v. Alvey-Ferguson Co., 331 F.2d 223, 224 (6th Cir. 1964))).

District courts in Tennessee sitting in diversity recognize that substantive-right exception as well as a statutory exception provided by Tennessee's so-called "borrowing statute," Tenn. Code Ann. § 28-1-112. Mackey v. Judy's Foods, Inc., 654 F. Supp. 1465, 1469 (M.D. Tenn. 1987), aff'd, 867 F.2d 325 (6th Cir. 1989) (explaining that Tennessee applies its own statute of limitations as procedural law unless the action "(1) is one encompassed by the state borrowing statute . . . or (2) is one in which the foreign state's limitation is not merely upon the remedy but upon the underlying substantive right"); see also, e.g., Bright v. Brookdale Senior Living, Inc., No. 3:19-CV-00374, 2020 WL 12893925, at *3 (M.D. Tenn. Apr. 6, 2020) (applying the borrowing-statute and substantive-right exceptions); Richardson v. Russell, No. 3:15-CV-869, 2016 WL 11431506, at *3 (M.D. Tenn. Apr. 20, 2016), R&R adopted, 2016 WL 2941039 (M.D. Tenn. May 20, 2016) (same). The borrowing statute provides: "Where the statute of limitations of another state or government has created a bar to an action upon a cause accruing therein, while the party to be charged was a resident in such state or such government, the bar is equally effectual in this state." Tenn. Code Ann. § 28-1-112. In other words, it gives effect to a foreign limitations bar

when the cause of action accrued in the foreign jurisdiction, the foreign statute bars the action, and the party to be charged was a resident of that jurisdiction. Id.

Here, neither exception applies. Maryland's Child Victims Act applies to "action[s] for damages arising out of an alleged incident or incidents of sexual abuse that occurred while the victim was a minor." Md. Code Ann., Cts. & Jud. Proc. § 5-117(b). The statute defines "sexual abuse" to include incest, rape, sexual offenses, certain sexual exploitation of children, and other criminal sexual conduct, id. § 5-117(a), and provides that qualifying actions "may be filed at any time," id. § 5-117(b). This case arises from Emala's alleged sexual abuse of Valancius as a child. But the claims Valancius asserts against the Diocese—negligence, negligent supervision and retention, negligent training, breach of fiduciary duty, fraud, emotional-distress, and related tort claims (see Doc. No. 1 at 12–33)—are based on the Diocese's own alleged acts and omissions concerning Emala. Because those claims are not "unknown at common law," Whitfield, 756 F.2d at 461–62, the Court cannot treat § 5-117's limitations provision as substantive as to those claims.

The borrowing statute also does not apply. It gives effect to a foreign limitations "bar to an action." Tenn. Code Ann. § 28-1-112. The Maryland Child Victims Act, however, permits qualifying child-sexual-abuse claims to be filed "at any time." Md. Code Ann., Cts. & Jud. Proc. § 5-117(b). That leaves no Maryland limitations bar to borrow. Accordingly, because neither exception applies, Tennessee's limitations law governs Valancius's claims.

That leaves the question of which Tennessee statute of limitations applies. The Diocese argues that the one-year period for "injuries to the person," Tenn. Code Ann. § 28-3-104(a)(1)(A), together with Tennessee's tolling provision for minors, id. § 28-1-106, applies. (Doc. No. 55 at 6–7). Valancius, for his part, does not appear to dispute the application of § 28-3-104(a)(1)(A) and § 28-1-106 if Tennessee limitations law applies. After his primary argument that Maryland's

statute of limitations governs, he refers generically to "the Tennessee statute of limitations" in his alternative argument concerning accrual and tolling. (Doc. No. 56 at 9).

Under Tennessee law, "to determine the applicable statute of limitations," a court "must identify the gravamen of each claim alleged." Benz-Elliott v. Barrett Enters., LP, 456 S.W.3d 140, 141 (Tenn. 2015). That requires the court to "first consider the legal basis of the claim and then consider the type of injuries for which damages are sought." Id. at 151. Here, although Valancius alleges negligence, fraud, and other tort theories, each claim seeks recovery for bodily or emotional injury arising from Emala's abuse. Valancius's claims thus are governed by the one-year limitations period for "injuries to the person," Tenn. Code Ann. § 28-3-104(a)(1)(A), together with Tennessee's tolling provision for minors, id. § 28-1-106.

B. Genuine Disputes Remain Regarding When Valancius's Claims Accrued

The Diocese argues that Valancius's claims accrued no later than 1976 because he knew by then that Emala had sexually abused and injured him and he had sufficient information to place him on inquiry notice of his claims. (Doc. No. 55 at 6–10). It also relies on Valancius's testimony that he learned in 2003 or 2004 that Emala had come to Baltimore from Nashville. (Id. at 8).

The Diocese has the burden of showing that there is no genuine dispute of material fact about when Valancius's claims accrued. See Swanson, 423 F. App'x at 592. It has not met that burden.

Under Tennessee law, a claim accrues in two scenarios. First, a claim accrues when the plaintiff has "actual knowledge" of the claim. Redwing v. Cath. Bishop for Diocese of Memphis, 363 S.W.3d 436, 459 (Tenn. 2012). That includes "not only the discovery of the injury but also the discovery of the source of the injury." Id. at 458. Second, and alternatively, a claim accrues when the plaintiff has actual knowledge of "facts sufficient to put a reasonable person on notice

that he [or she] has suffered an injury as a result of wrongful conduct." Id. at 459. That form of notice is called "inquiry notice." Id.

The Diocese has not shown the absence of a genuine dispute on actual notice. Valancius's claims against the Diocese concern its own alleged wrongdoing, including its prior knowledge of Emala's sexual misconduct and dangerous propensities and its decisions concerning his continued ministry. (Doc. No. 1 ¶¶ 82–191). Although Valancius knew by 1976 that Emala had abused him and caused him emotional harm, that knowledge concerned Emala's wrongdoing, not the Diocese's. (SUMF ¶ 5). Likewise, the Archdiocese of Baltimore's 2002 list identifying Emala as a priest credibly accused of child sexual abuse concerned only Emala's wrongdoing, not the Diocese's. (Id. ¶ 6). Similarly, the Diocese's own 2018 list identifying Emala as a priest credibly accused of child sexual abuse identified Emala's wrongdoing, not any wrongdoing by the Diocese. (Id. ¶ 8). Moreover, there are genuine disputes of material fact regarding whether the Diocese withheld from that publication its internal records and concerns about Emala, including information dating to the 1950s and 1960s. (Id. ¶ 10).

There is also conflicting record evidence regarding when Valancius first learned of Emala's connection to the Diocese in Nashville. The Diocese relies on Valancius's deposition testimony that he learned in 2003 or 2004 that Emala had come to Baltimore from Nashville. Valancius's earlier interrogatory response, however, states that he learned of the Diocese's role in Emala's move to Baltimore only after April 5, 2023. (Id. ¶ 4). Regardless, Valancius's knowledge that Emala came from Nashville does not itself indicate any wrongdoing on the part of the Diocese.

The Diocese also has not shown the absence of a genuine dispute as to inquiry notice. For the reasons already explained, Valancius's knowledge that Emala abused him, came from Nashville, and appeared on lists of credibly accused priests is insufficient to put a reasonable

person on notice of the Diocese's alleged knowledge of Emala's misconduct, its alleged role in his continued ministry, or its alleged concealment of that information. The Diocese has also not shown that a reasonable investigation would have uncovered that information. Genuine disputes remain regarding whether the Diocese withheld its internal records and historical concerns about Emala from public disclosure. (Id. ¶ 10).

For these reasons, genuine disputes remain over whether Valancius actually knew of, or should be charged with inquiry notice of, the Diocese's alleged wrongdoing by 1976, 2003 or 2004, 2018, or 2023. A jury must decide when Valancius acquired actual or inquiry notice of the Diocese's alleged wrongdoing and, therefore, when his claims accrued. The Court will deny the Diocese's motion for summary judgment on its statute-of-limitations defense.

## IV. Conclusion

For the reasons set forth above, the Diocese's motion for summary judgment (Doc. No. 53) will be denied.

An appropriate order will enter.

WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE